2140, Arthrex v. Smith & Nephew. The invention at issue here involved a technique for conducting surgery without having to tie knots. It was originally protected in the 280 application by filing a non-provisional. And then the inventors decided to make improvements upon that original invention. And they filed and protected that original idea by incorporating that idea in subsequent applications and claiming priority to it. The claim term at issue, or the question at issue, is whether there's written description support for each of the claims at issue. And if there is, the prior art that Smith & Nephew contends is prior art would, in fact, not be prior art. Your Honor, I would like to focus the court's attention on the actual claim term that was at issue in this case. And that is an eyelet that threads. That's all that was claimed and nothing more. There was no requirement that an eyelet be free sliding. And there was no requirement that any other advantage be captured by the invention other than an eyelet that threads. And, Your Honor, I believe the board, in reviewing this case, made two errors. Are you saying such a claim limitation doesn't encompass a flexible loop? Your Honor, the claim limitation would encompass a flexible loop. Would? Yes, it would. An eyelet that threads. Because a flexible eyelet, like rigid eyelets, both thread suture. And that is something that was established in the prior art and something that was established in the specification. In fact, the specification… Does it encompass a fixed aperture? It would include a rigid eyelet, Your Honor. And if we take a look at… In fact, what's interesting about this case is that Smith & Nephew had to concede for an eyelet covers… The eyelet issue covers both the flexible eyelet and a rigid eyelet. And so both species of this genus of an eyelet are, in fact, disclosed. The first species being the 280 application, the second species being subsequent applications, which, by the way, also incorporated by reference the flexible eyelet. And so when we start… in the chain, right? I don't agree, Your Honor. I believe that we do… Because the first applications, as I understand it, provide a written description support only for one of the embodiments. That's correct. It's for the flexible loop. And that's correct, Your Honor. In Bill's statute… So how could a claim that encompasses something broader than that species have written description support in an application that discloses only a species? I look at it this way, Your Honor. In fact, I kind of look at Smythe as very instructive on this point. If there's an application, for example, that discloses a lead weight as a one-pound weight, and then there's a subsequent application that discloses a pound of feathers as a one-pound weight, and let's just call that second application a CIP because the feathers weren't previously disclosed, we should be able to, as Smythe and Amgen instruct, claim a one-pound weight. And that's what we have here, Your Honor. We have… In that situation, do you have to have a written description support for both of those embodiments? I think Bill's statute teaches that all that is needed is one representative example to support that genus or one example that a person of ordinary skill in the art can immediately visualize and say that's, for example, an islet. And we have that here. We are not talking about something that is a matter, so to speak, of rocket science. It is an islet that simply threads suture. The ordinary dictionary definition is an islet that receives suture or which suture is passed or some material is passed. And the prior art was clearly undisputed establishing both flexible islets and rigid islets as teaching threading of suture and as being interchangeable both for knotted procedures and knotless procedures. And so I think that's the challenge here is that every time there is, in fact, a CIP, there's something else always added. And there's nothing wrong in the law that permits somebody to go back to claim their original broad subject matter of the first application. And that's part of the reason why I believe we have this practice of continuations in part. And so from that perspective, because we can establish... Well, I guess if application number one discloses a spoon, right, and then the continuation application discloses, well, you can use a spoon or a fork, right, you wouldn't be able to get priority for such a claim, spoon or fork, all the way back to the original application that only disclosed a spoon. Is that right? Well, it depends on how you claim it. And I think that's one of the benefits of being able to draft our claims. What if the original application disclosed a spork? A spork. Well, I think we could, for example, claim a generic claim to utensil because it was commonly known that spoons and forks are, in fact, utensils. And so it may seem odd, but that is, in fact, the whole purpose behind CIPs, that we should be allowed to go back and claim the broader subject matter that was disclosed. And I think we can all think of examples where that is, in fact, the case where we can think of something that was a broad idea, and here the broad idea was an eyelet that threads, and then something that embellishes that idea. Here, in this case, it happens to be a rigid eyelet. Can we move on to your constitutional challenge to the patent board? Your Honor, I would like to. Can I just focus on one point that I think was not disclosed by the board? And I would just very quickly point out that we made an argument about in race smite and amgen about common function and structure, and that was never considered. And the flexible eyelet disclosing the species or supporting the genes was never considered as written description support. With respect to the constitutional argument, Your Honor, I would submit that PTAP judges, because they have the ability to submit final written decisions, have the significant authority that the justices in Edmonds mentioned that pushes the line of the inferior, pushes the judges from inferior officers of the Constitution to principal officers, and that there is no, in fact, review, except on the instance that there is a request for re-examination, sorry, request for re-hearing granted. But even when the re-hearing occurs, doesn't that also occur by the same board judges that are not constitutionally appointed, according to you? The re-hearing does occur, or if it is, in fact, granted, it would occur by the, sorry, the... The same board judges, right? The same board judges, correct. And your view is they aren't constitutionally appointed and therefore ineligible to decide the question in the first case. So having them re-hear a case, could that possibly cure the defect? Your Honor, I don't believe that would cure the defect because you have to have at least a principal... I mean, Your Honor, first of all, I would point out that with respect to if they re-heard this matter, I don't know if Your Honor is referring to re-hearing this matter generally, but I believe the Supreme Court has mentioned that it would have to be a different panel of judges that would re-hear this matter if we were successful on appeal. Are you familiar with Standard Operating Procedure No. 2 of the Patent Board? Not that specific one, Your Honor. Okay, my understanding from the government's green brief here that that Standard Operating Procedure contemplates the director, sua sponte, convening a panel to potentially re-hear any board decision for the purposes of perhaps making precedential either an affirmance or a reversal or something else. And so therefore, at least right now, there's something inside the agency that contemplates the director making a move on a patent board decision. Your Honor, I'm familiar with that rule. I'm sorry, I didn't know the number. But yes, the patent exam—I'm sorry, the director can certainly—well, he can on his—I'm sorry, let me rephrase. I don't believe the director can on his own institute re-hearing. There must be a petition that's filed according to the rules for re-hearings. And because of that, and because that panel that would have to be to re-hear the matter would still consist of three judges as well as other members of the PTAB who are not constitutionally appointed. So even if— It is a fine written decision. Even if the director was to inject herself into the fray as a panel member in order to review a decision, does a director retain its same authority as director or does a director at that point become just another mere panel member that's bound by the law? Your Honor, I believe he just becomes another member of the panel. And from that perspective, I think that it can be said that the decision that is written— and by the way, that interjection only comes by intervention on appeal. And so for that reason, I would also add that it supports the contention that these PTAB judges are in fact principal officers. Does the statute ever speak about the PTAB director or the director reversing a panel decision based on either political or policy reasons and not the law? I'm sorry, Your Honor. Say that again? Does the statute speak to the authority of the director to review a panel decision on the basis of policy—the agency's policy objectives as opposed to just the law? I'm not aware of anything that requires the judge or the director to be able to make a decision in that regard. My recollection is that the APA in some regards constrains the director because there must be some sense of independence and that there must be some sense of a fair hearing and that it can't be politically determined, which is something that I think limits the power of the director. Mr. Cho, you're well into your rebuttal time. Would you like to save the remainder? Yes, Your Honor. Good. Let's hear from Mr.—is it Steenberg? Yes, Your Honor. Good morning, Your Honor. My name is Charlie Steenberg. I'm behalf of Smith & Neff here at NR3Care. As Mr. Cho noted, the central issue here is whenever a description of support, which is an intensely factual issue. Here, the board made a series of well-supported findings concerning whether the applications filed over a 10-year period from 2003 to 2013 supported a generic first member that everyone agrees is construed in the 2014 application could be either a flexible loop or a rigid implant. However, as the board noted, the applications for a 10-year period between 2003 and 2013 expressly warned against the flexible loop and noted that it could cause bone damage and abrade tissue. Instead, the present invention is described over a 10-year period was for a device that allowed for the free sliding of suture, which is Arthrex Notes, for instance, in page 6 of its reply, the flexible loop cannot possibly achieve. The applications, including the 707 application filed in 2003, on which the board focused, describe several different embodiments of suture anchors that allow for the free sliding of suture. What's your argument that there can never be an incorporation by reference in situations where you have a disparagement of the claims or aspects of the written description? Your Honor, we, as the board found and we agree, there was an incorporation by reference here in the background section. That, however, is just the threshold question. It leads to the follow-up factual question of what is the import of that incorporation by reference and how would a person, whether a skill in the art, understand that incorporation by reference. In that sense, the case is very similar to Tronzo and as cases like Tronzo and Anescape and Bamberg, which applied Tronzo, note, you can have situations in which a material in the background is described negatively. That is for purposes of providing context for the invention. Furthermore, as Anescape particularly notes, the issue here is not one of disclaimer. That is, you can have situations where the properly construed justification reads on broader claims, but the disclosure does not support those broader claims. Anescape is a case in point. Properly construed, as this court found, the controller could encompass devices that were not capable of six degrees of freedom. However, the problem for the patent owner in that case was that their alleged priority document taught the importance of six degrees of freedom and thus did not support the claim as interpreted. In this case, was the board limited to the scope of what was incorporated by reference? The board considered the incorporation by reference. That is the entirety of the application. If you look at pages 28 through 30 of the board's decision, the board noted that what R6 is arguing about incorporation by reference, looked at it in a vacuum, in essence, without taking account of the 707 applications. The 707 disclosures as a whole, to the point that even while the 707 application and the other three applications filed over a 10-year period, note that alternative embodiments beyond the three specifically described in the application allow for the presiding a suture. Even alternative embodiments needed to allow for the presiding a suture, which again is precisely what the flexible loop cannot accomplish. Can you get to the appointments clause argument? Certainly. As an initial matter, this argument was never raised before this court. Unlike, for instance, the retroactivity issue in Peters, where that candidly was a pure question of law in which input from the board would not have impacted this court's decision. Here, the relevant question is the extent of supervision by the director of the board. And on that issue, I submit the input from the board at the stage of the IPR itself. How does a director supervise the board if the director steps in as a panel member? Isn't the director bound to the same responsibilities and the same parameters as a regular panel member? The director does not become a super panelist, right? To my understanding, it's not as if the director is a member of the panel and could magically supersede. If the director is bound by the same law as a regular panel member, then how can you say that the director is supervising the panel? Several things, Your Honor. For one, the director, in talking about applying the relevant law, the director has a key role in establishing particular board decisions as precedential. The director has a key role in setting forth policy for the board. The director, furthermore, has responsibility for appointing panel members. And as the Supreme Court found in Edmund, I believe, and has also been held elsewhere, the ability to control panel assignments is a key aspect of control. And by contrast, I'll note that out of the two cases that RSpecs cites that found an appointments clause violation, one is the railroad case, which is so factually distinguishable that RSpecs doesn't even mention it in its reply. The other is the intercollegiate case in which the relevant board consisted of three members that already sat on bonk without any input from the librarian or Congress as to panel assignments. I'll also note, going back to the issue of waiver, that RSpecs is uncommonly unworthy of being a court at the benefit of this court looking past the issue of waiver when it itself has repeatedly filed IPRs, including several IPRs that literally were decided or addressed by the exact same panel that we have in this case. How do you get around Freytag? Didn't Freytag deal with the exact same waiver issue? Freytag noted that, first of all, this is a matter of discretion. So, just to be clear, so we have the authority to choose as a matter of discretion whether to find the issue waived or not? Absolutely, Your Honor. My point simply is that in Freytag, I believe the exact language of the Supreme Court was that Freytag's challenge was neither frivolous or disingenuous. Here, by contrast, we submit that RSpecs, having repeatedly benefited from the IPR system, including IPRs in which, again, they literally haven't seen it. I understand. There's a system that exists, and if they want to challenge patent rights, are you saying that they shouldn't do it if they believe there's an unconstitutional appointments clause? Or if they're the challenger, they have some obligation to, as part of their challenge, bring an unconstitutional appointments clause? In this instance, if RSpecs wanted to raise and preserve this issue, then yes, we submit that they should have raised it at the board stage, and we would have had the benefit of… No, that's a different answer. You're suggesting to me that the fact that they themselves filed other IPRs should prevent them from now, in this IPR, challenging the appointments clause. And I'm saying that I don't understand that argument. I apologize, Your Honor. In a scenario in which RSpecs had raised this issue at the board stage, then I agree. The fact that they separately had filed IPRs of their own would not be a bar – would not have been a bar to the board addressing the appointments clause issue and this court in turn addressing the issue. Does the board have authority to rule on its own constitutionality? In certain cases, as applied, Your Honor, yes. But this is not an as-applied challenge. I understand they're briefed to be not an as-applied challenge, but rather a facial challenge. Well, in the case of… Does the board have the authority – I mean, I think D'Atrina's question is an excellent one. Does the board have the authority to rule on a facial challenge to their own proper appointment under the constitution? I would defer to the government, Your Honor, but I'm not aware of specific authority to that effect. Further, finishing my response to your question earlier, and I realize that… You've exhausted all of your time and you're now using the government's time. Would you like to continue? No, Your Honor. Okay. I just wasn't sure if you were aware of it. I didn't know if you knew they set the clock to 15 versus 10. Yeah, I did. Okay. May it please the court, Melissa Patterson for the government. The government intervened on two issues, including the constitutional issue that the court discussed this morning. As an initial matter, both of those issues were forfeited by Arthrex for failure to waive for the board. Do you agree that we have the discretion to address those issues? Absolutely, Your Honor. As noted in both Freytag and DBC, courts certainly have the power to overlook a forfeiture of this kind, but as this court also explained… Honey, I haven't seen any of those cases referred to as a forfeiture. It's usually a waiver. A forfeiture sounds much more serious. I think there's a Supreme Court case explaining that forfeiture technically applies to when you're just silent about it, whereas waiver is when you affirmatively say… In Freytag, they were silent all the way until the Supreme Court, right? Indeed, Your Honor. And yet they didn't refer to it as a forfeiture there, did they? I think they actually may have, Your Honor. But we're using them more or less interchangeably here because it isn't as if Arthrex came in and said, we think these judges are very, very constitutionally appointed, which I think would fall into the classic waiver box. Our point here is that in DBC and in Freytag, the courts looked to whether or not it was an appropriate use of the discretion. First off, we're not bound by DBC, right? Every panel can exercise its discretion, correct? You are bound by DBC insofar as it's finding precedent of this court that says that only in exceptional cases should the court overlook a forfeiture. Did DBC's facts parallel these facts? In many ways, it did. It was also an appointments clause challenge. But in that case, didn't they rely on the remedy? The fact that Congress, one of the reasons they chose not to exercise their discretion was because Congress had already remedied the situation. The secretary had already started implementing that remedy, so it drastically limited the impact. That's one of the reasons, but there were others, Your Honor. But doesn't that make it a case that is really significantly different from this one? Because if there really is, in fact, a constitutional problem here, it is ongoing and every case being decided will be infected by it. So wouldn't that, unlike DBC where it had been resolved, wouldn't that make a pretty big difference in terms of the exceptional importance of whether or not we should deem this waived? That's one of the considerations in DBC, but it's not the only one. And of course, DBC also talked about the problem with incentivizing sandbagging. But so did Freytag. Freytag had the same set of facts. The only difference between, say, Freytag and DBC, as far as I can tell, is that in DBC a remedy had already been provided by Congress and been implemented by the secretary. I don't see any significant difference. What am I missing? Is there a difference between Freytag and DBC? Well, in DBC, of course, this court interpreted Freytag and said that the appropriate analysis— In a situation where a remedy has already been provided and already been implemented, we choose not to exercise our discretion. Again, that's one of the factors in DBC, but it's not the only one. And if the concern is that this court is not going to get a crack at this issue because nobody has preserved it, this court need not worry. Because in case 18, 1831, the Polaris case that has already been scheduled for argument on November 4th, Polaris did preserve this issue.  I'm sorry. Can we move along? Because I'm interested in hearing an answer to Judge Rayna's earlier question about whether the board, in this case or really any other case, would it have the authority to review this Appointments Clause challenge and then potentially decide for itself, we have to—we conclude that we've all been unconstitutionally appointed, and so therefore this is an unconstitutional statute. And in fact, an unconstitutional decision at that point. Go ahead. Right. Well, not quite, Your Honor. Suppose—the top line answer is yes. The board does have the authority to address constitutional issues. And if you look at the Supreme Court's decision in Elgin, there, even if the agency can't actually do anything about it, the agency can offer—shed light on threshold issues about how the statute works. Here, there's a debate in the briefs about such things as which removal statute applies to these judges, which is a key factor. I understand that the board, with all of its experience and insights on how the board operates and what it does and doesn't do, maybe the board could offer something on that. But would the board even have the authority, if it were to conclude that the statute—that they were unconstitutionally appointed, they wouldn't have the authority to issue such a decision, would they? Well, I think it would, Your Honor, under the—it would come at the institution stage, which of course is done on the director's authority alone. And the director—let's just suppose a counterfactual world in which there actually were an Appointments Clause problem, which there is not. But if the director got a petition, said, oh my goodness, there's an Appointments Clause challenge here. Actually, there's a real latent defect in Section 6 here. He could decline institution on the basis of a conclusion that there was a statutory defect. Recall that inter-parties review is never mandatory. The director, as the Supreme Court explained in Quozo, has unfettered discretion to decline to institution. So then the challenge would have to be raised in a preliminary patent owner response before an institution, not after the institution. Yes. Is that right? I certainly think that would be an opportunity for the patent owner to raise it. So, I mean, you couldn't—it wouldn't be a preserved issue if you only raised it after the institution. As a practical matter, Your Honor, of course the director can reverse an institution decision, can essentially un-institute. So even if the patent owner provided it in a response once institution had occurred, there's still a mechanism for the director to address the issue and call off the inter-parties review. So I don't think that there's any practical problem with litigants raising this issue before the board and giving the board a chance. And as DBC said, all you have to do is give them a chance. Even if the board's not going to actually weigh in on the issue, you do need to give the agency a chance to explain the statutory scheme that could obviate some of the constitutional issues. Aren't you getting that chance right now? I mean, one of the significant powers that you argued on the merits the director has that should be important in this consideration is the ability to intervene and to put forth his views. So aren't you having the opportunity now to put forth those views? We are, Your Honor, and we're happy to address some of the merits. But of course, as this court and the Supreme Court has explained, the appropriate time to raise those challenges is before the agency. Can we get beyond—I'm trying to move you beyond waiver. Absolutely, Your Honor. Can you please get beyond waiver and get to the merits? Let's address some of the merits questions. So one thing that hasn't been discussed this morning is the director's authority to issue binding policy directives that bind everybody, all the other judges, all the employees of the PTO. And that can come at any time. It can come before the PTAB engages with the decision and applies the law, or it could come after an initial panel decision comes down. So there are sort of three different buckets of control that the Supreme Court has looked to in principal officer challenges. Recall that we're trying to figure out whether or not these judges are, quote, at some level supervised and directed by a Senate-confirmed, presidentially-appointed officer. And here there are two different PAS officers, both the Secretary of Commerce and the director of the PTO, who supervise and control the judges. So there's these sort of three different ways in which that happens that are relevant under the Supreme Court's admin analysis. First is regulatory. Second is removability. And third is to the actual substance of the decisions. How can you review? How can you engage with the substance? So regulatory, removability, and reviewability, the three Rs. Go ahead. Exactly, Your Honor. So certainly I don't think there's any dispute here that the director has the regulatory authority here. He can set out, you know, both under 2B and under 316. The director is the one who gets to construe the statute and promulgate regulation. So he doesn't have substantive rulemaking authority? Under 316, the Supreme Court explained in quoso that the rule there, even if considered, it was the broadest reasonable interpretation rule, even if considered a substantive rule under this Court's 2B line of cases, that it was still a proper exercise of the authority. So we're not solely relying on the – we're not just talking 2B authority in inter-parties reviews. We're talking 316 rulemaking authority. When the director issues examination guidelines for its examiners, Section 101, Section 112, Section 103, is the board members, are they bound by those examination guidelines? Yes, Your Honor. And I think, in fact, the director's recent one-on-one guidance released in January 2019 applies to all employees. Does it say that in the guidance document that APJs are bound by these examination guidelines? I'd have to go back and check, but I assure you that the director and the agency expects all of the employees, including the APJs, to follow, in this example, the one-on-one guidance the director sets out. The director is in charge of this office. He has uncontested authority to issue that type of guidance. He does, but it's – what I don't know for sure is to what degree do members of the board believe that they are bound by such examination guidelines. Those examination guidelines are clearly set out for examiners, just as the manual patent examining procedure is set out for examiners. But I don't think the board is necessarily bound by the MPEP. Well, I think it's uncontested. I think that that guidance actually does apply to everyone, but even if it didn't, I don't think anyone is here saying that the director couldn't make it. So the director could issue the same sort of policy guidance and label it, attention APJs, this means you. And at that point, the APJs are required to follow this binding policy guidance. So in terms of the R, the substance box of the decision, the director doesn't have to wait until the panel spits out a decision embracing a view of the law he doesn't like. He can actually get out ahead of it. In a lot of ways, this is more significant. I understand that if the director somehow helps engineer a presidential board decision, then the board is bound by such a presidential decision. But I'm trying to figure out about everything else that's not a presidential decision. I suppose if there was a board presidential decision that said all members of the board are bound by the MPEP, then the board would be locked in. But right now, there's nothing in the MPEP itself that says that board judges are bound by the contents of the MPEP. It specifically says examiners are, but it doesn't say anything about board judges. Your Honor, the director absolutely. Anything he could do by deeming a board decision precedential, which let's note he doesn't have to engineer it. The director has the sole authority. I mean, I'm just thinking about some board decisions I'm aware of where board, maybe there aren't board members who have said things like, well, those guidance documents are just guidelines. They're not really things that they're bound by. And so I'm just trying to understand what is the relationship between the board and these various guidance documents. Any guidance that the director explains should bind APJs. And my understanding is that he's already done that with things like the 101 guidance. APJs are required to apply. And if an APJ, in fact, said something like guidance, here's what I think the law means, that would indeed be an errant board member. And at that point, the two different forms of removal authority, which the Supreme Court and Edmund explained are an extremely powerful tool of control, might well come into play. APJs do not have the authority to naysay the director's binding guidance. So we have a very robust substantive control. You're still on regulatory, but I thought you were launching into removability, which is you said the two forms of removal authority. What are the two forms of removal authority? The two forms of removal authority are, first, the director's unfettered authority to designate panel members. Okay, so let me ask you that. The statute actually unquestionably gives him unfettered authority to designate who sits on what panel. What it doesn't give him is the authority to de-designate. And so I'm a little confused because removal is something that is discussed in many, many, many statutes. Removal from judicial administration, removal from your job altogether with or without cause. Where does the statute give the director the ability to de-designate panel members as opposed to designate? Removal authority follows appointment authority, Your Honor, and many statutes are silent on the question of removal. And dating back to the Supreme Court's, I think it was 1923, Myers decision, when Congress is silent about removing somebody for a role, you should look to who has the appointing power. So we think Section 6, which gives, as you said, I think it's uncontested, that the director has the unfettered authority to appoint, but also gives him the authority if he thinks a judge is errant, to use Judge Chen's word, that he could change the panel. And you're not concerned with, say, Justice Ginsburg's comments in oral argument that that would amount to a due process problem, or Judge Dyke's opinion that followed that same line of concern, that that sort of panel stacking, that messing around like that, would create a due process problem? You don't have a concern about that? You know, if somebody thought that their due process rights had been violated by a particular use of the director's authority, they could certainly bring that challenge. But recall what we're sort of getting attacked from both sides. You know, we have Arthrex here saying, you don't have enough control. You're trying to tell me that the director has the control to de-designate anytime he doesn't like. In your brief, you even said mid-case. Mid-case. He could pull an APJ off of an IPR that he's midway through deciding, if the director so chooses. And I'm saying I don't see where that is in the statute. And your response to me was, well, you should just assume it's there because they have the power to appoint, and since it's silent, they therefore have the power to remove. And I'm saying, well, what if that power to remove, mid-case, that you're suggesting, would amount to a due process violation? Should I still assume the director has that authority if it would create due process concerns? I think the top-line answer is yes, Your Honor, if I could just explain why. You can always imagine circumstances in which an agency might abuse or misuse its power. So if the director were to say something like, I'm going to change the cases so one of the petitioner's buddies is on the panel, maybe that particular use of the authority would create a due process problem. But recall that we read statutes in order to obviate constitutional concerns, not to read them in. And we have folks here today saying, this director does not have enough control over the office. And what we're saying is you should read Section 6 in the way that removal and appointment power traditionally is read, even without constitutional concerns, to mean that the director has control over who hears particular cases. So I think that you even said in your brief that it could go so far as the director deciding to never appoint a particular APJ to any case. Is that right? That's right, Your Honor. Really? So why would he be hired? I mean, would there be a concern there about fraud, waste, and abuse since the obligations and job descriptions of an APJ are laid out clearly in the statutes and the regs, and if you take all of them away and we're continuing to pay them, what happens then? That seems really suspicious or concerning. At that point, the Secretary of Commerce, who has the ability to remove APJs from government service entirely, might well decide to initiate that type of termination. And that termination would have to be in the interest of the efficiency of service, and so it would be there, according to you, because the director has decided that they're not going to appoint them. I'm not going to appoint you to any cases. Therefore, your service is inefficient? I think that's a possibility, Your Honor. It doesn't sound just a tiny bit circular to you? No, Your Honor. I think that that is two different forms of removal authority contemplated by the statute working in tandem. These are signs of control between the president and these APJs. Does removal for the efficiency of service have embedded within it a notion of misconduct? We're getting a little far beyond the briefs. No, we're not, because you told me that this is the removal authority, so I've got to figure out. Say I adopt the statutory section that you say governs removal, 7513. It says removal for cause in the efficiency of service, right? Yes. So what many of the cases that you've cited to me talk about is more of an unfettered removal, removal without cause. Well, of course, this Court's decision in Messiahs talks about a much higher removal standard. Yes, but there you had reviewability, which we don't have here. So don't even try to go there yet. We're going to stick with this first. So I understand that I agree with you. Messiahs has probably an even more difficult removal process inherent in it, but it totally has direct reviewability. So it has your three buckets. It's got two of your three buckets completely and one of your three buckets less so. My concern is you've got one bucket completely, supervision, and the other two buckets, eh, not so much. So that's where I am. I'm afraid you're one-third full, my friend. And so that's why I want you to focus on that notion because you can't point to Messiahs and say there was less there because it's all a balancing act. A couple of things, Your Honor. Let's return to the buckets. I think we all agree the regulatory authority is within the director and that that's a relevant form of control. When you say we all agree, I'll say you assert it. Go ahead. No one has contested here in this proceeding. Whether or not it is sufficient to meet the standards set out in Edmund is a different question. Well, and, of course, we're advocating a mosaic approach. Edmund itself said there's no sort of exclusive criterion. We sort of look at the landscape as a whole to see, do these folks report directly, are they controlled only by the president, or are they controlled by somebody else? So we've got the regulatory bucket. We've got the removability bucket, and we have two different. I think the question is, are they controlled by the president or are they controlled by someone else? I don't think in Edmund or in any other case when they were deciding whether they're principal officers, the Supreme Court said, well, let's see what exercises the president has for these people. I'm not sure that's right, Your Honor. The question in Edmund was, you know, to decide whether you're inferior, we decide whether or not you have a superior, and if that superior is only the president, you're a principal officer. But if that superior is another presidentially appointed, Senate-confirmed officer, then you're an inferior officer. So returning to our buckets, even if you thought that the very – the efficiency of the service standard under 7513 – Can you answer my question about whether or not it implicates misconduct? Do you think it can implicate misconduct? I'm trying to get you to answer the question. But the relevant form of – Yes, is your answer yes, it implicates misconduct, or no, it does not? Yes, it can implicate misconduct, and one form of misconduct would be insubordination. So returning to the example we discussed earlier, if an APJ disregarded the binding policy directions of the director in issuing a decision, then that – I think that would be a fair grounds for removal under 7513 as a form of insubordination. But that's not the only – Is that in the performance plan for the board judges? That they have to follow all guidance documents by the director? I don't know if that's written down in their performance plan, but I think it certainly could be. If the director was having a problem with employee insubordination within the PTO, that would certainly be one of the options. Okay, but it does implicate some form of misconduct. So you agree it's different than without cause? I do agree, yeah. That there is a gap? On that basis, it is. But that is not true of the director's authority to functionally remove judges from judicial service. And recall that in Edmond, that was the relevant removal power. Nobody thought the JAG there could remove them from service entirely, which is the 7513 colleague we've been having. Edmond says to remove them from judicial service. Oh, no, I understand your point. The other problem you have is, again, I'll likewise look at this as the mosaic that you want me to, is in Edmond there was reviewability as well. So we are so far over, but I really want to hear your thoughts on reviewability. Yeah, and so the reviewability mechanism here we think looks a little different than Edmond, but the reviewability is all about the substance. And, of course, in Edmond there wasn't sort of unfettered ability to change facts. You could only, it was, I think, a deferential standard of review on the back end. Here we think the reviewability comes both at the front and the back end. This is the ex ante ability to issue finding policy guidance. And then if you think that a panel... How does that have anything to do with reviewing a decision in an individual case? Because a review of a decision is about whether or not the substance of the decision was right. Did the decision maker get this right or did they get it wrong? Okay, and so when they get it wrong, when it has not followed the director's policy, does the director have the ability to say, ha, that I'm not letting it issue? The director has the ability to convene the rehearing panel to vote on rehearing. No, he doesn't. He has the ability to ask to have a panel decide whether to rehear a case. He has the ability. I think there's a little bit of nuance there, Your Honor. I agree that he does not have the authority to grant rehearing, but he does have the authority to... To ask three people to think about rehearing. Including himself to decide whether or not rehearing. But recall that in the interim, between the issuance of what he thinks is a bad panel decision and the convening of a standing presidential opinion panel, the director, if he thought that the original panel had missed the boat on the law, he could issue a binding policy direction that then would guide both the decision to grant rehearing and the substance of that decision on rehearing. So even though the review mechanism, I agree, it's not quite the same as an admin, we think it's still a real and practical way for the director to exert control. That's an interesting argument. It's unfortunate you didn't make it in your brief, this argument about how he could, in the meantime, issue a... I'm sure you thought that up in your mooting, which is great, but this argument that he could make this interim policy direction, like between when the decision issues and when the rehearing panel is thinking about it, he could, boom, here's my policy directive, now you have to follow it, rehearing panel, and then they don't, so then what happens? Because he's only one member of the rehearing panel, so the other two judges say, uh-uh, not doing it. Well, those judges would be just as errant as the original judges that we were discussing earlier, and I don't think that we should... Not really, because what if they just don't grant rehearing? Then he never knows why, right? They don't have to write an opinion explaining why they're not granting rehearing, so they don't have to subject themselves to the misconduct of insubordination by openly indicating they're not following his policy guidance. They can just, I vote no on rehearing. In terms of the ability to control the substance, it's not perfect, but it wasn't perfect in Edmund either. Recall that the reviewers there had to defer to the factual findings. And look at intercollegiate... Okay, are there any other review powers other than the one that you just articulated? I just want to make sure I understand your argument altogether. And I want to make sure that we have, in terms of the mosaic, of all the control mechanisms, we've got the authority to issue binding regulations. We've got the ability to remove them from judicial service. We also have the secretary's ability to remove them from government service entirely. We've got the ability for him to designate any decision as precedential or to de-designate a decision as precedential. I don't understand what you think that gets you. Which bucket do you think that falls into, just so I know where to put it? I think that falls into the substantive review bucket, Your Honor. The fact that he can designate an opinion as precedential means he can review individual opinions? I don't think that there is a neat breakdown between this type of review you're talking about and the ability to dictate the substance of decisions. Really? Because the Supreme Court did. I mean, they said review was whether or not you are the final decision-maker on a given case. I think looking at the D.C. Circuit's analysis and intercollegiate might help here. Me too. Okay, so if this case is exactly like intercollegiate, what do I sever? Stop. What do I sever? Well, we do have various options as fallback arguments in terms of what the court could sever. First, the court could read Section 3 to not provide any removal protections for APJs. So I would scratch out the words officers and? I don't even think you need officers and. There are many officers of different varieties. I think that you would just... What do you mean? What are the other officers? I don't know. I made a list. There aren't, actually. I don't know, Your Honor. There's TTAP judges, PTAP judges, and the two commissioners. There are no other officers that I'm aware of or even alleged to have ever been officers, but okay. We think the way to do the least violence to the statute but get to the end that you're articulating is to simply read Section 3 to not extend to any officer whose appointment mechanism is set out by specifically in the statute. So that would be APJs. So here's my problem with that. What I'm struggling with is in all of the severability cases I've read, it's literally a matter of excising language. It's not a matter of rewriting your own language. And I'm a little worried that what you're asking me to do is an exercise in writing the statute as opposed to just cutting out a tiny, tiny little unconstitutional part to make the rest constitutional. We do have a scratch-out option, Your Honor, but before we get to it... But why can't the scratch-out option just be officers and? I'm just not sure what collateral effects that would have. That's not specifically what we prefer. But it would cure the unconstitutional. I do agree. You agree it would cure the unconstitutional. If there is an unconstitutional defect, it would cure it here. If there were an unconstitutional defect and if this court thought that that resided in the whatever fetters exist on the removal authority, then yes, it would cure it. If the court wanted to re-identify another saving scratch-out, as you call it, mechanism, which is to redline the... Do you honestly think, before you identify the other one, that I could write into the statute something as part of severability? Because you said read Section 3 as somehow not including the PTAB judges. How do I say officers, parentheses, except PTAB judges in Section 3? Your Honor, of course, as the Supreme Court made clear in the NFIB decision, just because something is not the most natural reading of the statute does not mean that it's not a possible reading of a statute to obviate a constitutional concern. We certainly think it would be a fair reading, not a rewriting, of Section 3 to say that the cross-reference to Title 5 governing federal employees, which is the only way that the Section 7513 comes in here, only applies to that personnel within the PTO whose appointment is not specifically provided for by statute. So that would include the APJs, whose, of course, their appointment is specifically provided by Section 6. We think that does the least violence to the statutory text. We think that's a fair reading of the statute. But all the other officers that I just articulated, which I think are the only officers in the PTO, are separately provided by statute. TTAB judges are separately provided by statute, and both commissioners are. So are you a little concerned that if I do what you're asking, I've now affected the Title 5 rights of exactly the same bucket of people? I'm just not sure, Your Honor. The reason that I'm resisting your officers and scratch-out is that we have not surveyed to see if there's anybody else who's not specifically provided for by statute who might qualify as an inferior officer or otherwise be considered an officer within the APJs. But you do recognize that if I make the change, the constructive change that you're suggesting, I have also affected TTAB judges and the two commissioners, right? Because they are all appointed by statute. Yes, well, the commissioners, I believe, have removal provisions specifically written into the statute. So I don't think we need to be concerned with them. But I do think it's a fair rate, maybe not in the most natural way, which is why we have not adopted that reading today. No, I know. You told me to sever something in Section 3 and didn't tell me what to sever in your brief. You suggested that severing could solve the problem, but you never gave me the express way I was going to sever something. I think our only express severance argument was in Section 6 with at least three members. If this court thought that the requirement that three members, three APJs, which can include, of course, the director, deputy director, have to vote on a final written decision, in the hearing or otherwise, we think that it would be a possible severability argument for the court to eliminate the at least three member requirement. We do not think that the entire statute would need to come down because of any defect that this court found in the Appointments Clause. So what would be the consequence of that? If the court were to delete at least three members from Section 6, then how would the board operate in a way that you think avoids an Appointments Clause problem? I think at that point, there would be no statutory minimum on the number of APJs who have to issue a decision at that point. So then what happens? Does the director, as an APJ, issue every single final decision? Not necessarily, Your Honor, but he could issue decisions alone at that point. Recall that the statute vests all of the powers and duties of the office in the director himself. So then the director issued board decisions, and in that scenario, would be appropriate under the Constitution. But anybody else doing it, it wouldn't be constitutional. No, not at all, Your Honor. Of course, at that point, the director would be assigning anywhere between one and three APJs to issue decisions. Oh, my gosh. So then you're going to have all decisions, not just you're going to have every appeal, every derivation proceeding, every post-grant review, and every inter parte proceeding could be decided by a single panel member of the board, any random one. Anyone that the director specified. And you think that does less violence to this process than just saying officers and aren't included in Title 5? Your Honor, we don't think any violence. That is profound, the impact that you're suggesting there. Every one of those proceedings would go from having three adjudicators to having one. Do you know how many board decisions we get with dissents? And do you know how useful that is to the proper vetting of these processes? You're taking IPRs out of district courts and having board judges hear them who aren't Article III appointed people. And now you want to say only one judge can get rid of all those patent rights? A couple of things. One, the director, of course, would still be able to appoint three judge panels. If he wanted. If he wanted, yes. Just as he can now appoint larger panels than three. And you don't think that, wait, you think Congress, so I'm supposed to divine Congress's intent in all this and preserve it to the greatest extent possible when thinking through severability. You think Congress would care more about possible officers that you can't name because you're not sure because you haven't made a list and that I can't think of. Their Title V rights being impacted versus you think Congress intended for all of these different proceedings to be able to be held with a single judge? Your Honor, it depends on what the court thinks the constitutional defect is. I'm sort of shadowboxing here because if the court thinks the problem is that there is not enough removal power, then the remedy would be to do something to Section III. But the problem isn't any of those. The problem is collectively. It is a mosaic. Every case, the Messiahs, Edmonds, all of them, it's balancing the three. So if I take some out of this bucket, there's got to be more over here to make up for it. So the problem can be solved, I think, by helping to fill any of the buckets if there's a defect. Can't it? I mean, can't there be a total absence of reviewability as there was in some cases and still have it be constitutional because the other two buckets are totally full? Or can't it be that there's an absence of removability, but the other two buckets are totally full? I mean, it doesn't matter, does it, which bucket has a deficit? Because there's no doubt that this is an unfettered removal authority. And there's also no doubt that this is pretty low on the reviewability scale. So it kind of doesn't matter which one gets filled more, maybe, to push it over the edge for constitutional purposes since it is a balancing act. I do want to put back to you. You agree with what I'm saying? I do agree with the weighing and the mosaic approach. But I just want to note that I disagree with one of the premises about the unfettered removal authority. And that is because there is no fetter on the director's ability to assign or reassign panel members. And that is precisely the type of removal from judicial service that the Supreme Court deemed a very powerful tool. Suppose that I don't agree with your interpretation since all of the other cases talk about for cause or not for cause. And Evans even cites some of those cases. And so suppose I don't totally agree with your notion that it's just removal from a given case or something like that. From judicial service. But you think the better course of action is to change all three member panels to allowing the director to make them one member panels across all of these different types of proceedings. I don't actually think that we have set out a preferred saving mechanism. We have identified various options. You don't think that would do significant violence to the entire scheme, not just IPRs, because this is the statutory section that applies to all the different proceedings. Correct, Your Honor. But I don't think that we have identified a preferred route. Of course, our preferred route is that you uphold the constitutionality of the judges. I guess for me, I understand that if this case is similar to intercollegiate, and intercollegiate severed the constraints on removal power, and then likewise in free enterprise, the Supreme Court severed out the constraints on removal power there, then there's a track record for doing something like that here with Section 3, the current constraint on removal power of APJs. But the other theory you have, which is to remove the three member requirement for any board decision, it's not clear to me yet how that increases the board's supervisory power as a principal officer over a set of inferior officers. I think it's because at that point, the director could reserve to himself any decision on either rehearing or as an initial matter. So if the director thought that there was a problem, he alone could fix it. The problem that Arthrex has said exists in the scheme is that the director alone can't do it because it's one of three. So if you got rid of the three requirement, we think not that the director would have to in any particular case, not that he can still assign three judge panels, but he could as a matter of raw statutory power. Because right now, the statute says rehearings are granted only by the board. That's right, Your Honor. So I guess it depends on what hat the director is wearing at that point in time. The director is the director for director purposes. But when the director stands in the shoes of being a board member, then he's a board member. Then he's an APJ at that point. And then he's satisfying the statutory requirement of granting a rehearing, even if he could by himself serve as the quote, unquote, board. Well, Your Honor, I think at that point, if we got rid of the three-member requirement, it would be very much the same as any other agency where there is a single head. So the commissioner of Social Security certainly isn't in there making individual Social Security decisions. But by statute, he could. And so therefore, the political accountability, which is what the Appointments Clause is concerned about, resides with the commissioner of Social Security. Similarly here, again, we think that it is very clear who's accountable for the decisions of the PTO. We think it is the director and the secretary of commerce. But if there were a problem that this court found in the political accountability. Unlike the Social Security context, the alternative isn't district court litigation. I mean, your problem is, to some extent, you have argued, you, the government, so strongly about what the PTO is and how equivalent these are to district court proceedings, IPRs. You argued that so vociferously throughout the process leading up to oil states and SAS. I mean, your briefs are replete with the analogies and the strength of that and how the board is so significant and that this is very similar to all the protections and all of the events that would occur in a district court proceeding. But now you're saying we should, and that Congress might have intended or would be content with the idea of the director doing all of it all by himself or single handedly or designated a single-handed minion to do it. It's very hard for me to imagine that that is consistent with the scheme that Congress intended in light of all the PTO's arguments, especially over the years. I think the importance of the inter-parties review proceeding actually cuts the other way, Your Honor, rather than jettisoning the entire inter-parties review. So you're saying if the whole thing has to go, for God's sakes, this is a better alternative. Congress didn't want the whole thing to go. But that's why I'm still sort of perplexed by your not lovingly embracing the elimination of officers and. I just. I think we get to the same place, Your Honor. That's just not a particular. No, we don't. We don't dramatically change the entire scheme if we take out officers and. We just deprive a few unknown people of a few protections. But wait, let me just point out, if the thing's unconstitutional, they don't actually have those protections anyway, because they were not rightfully appointed. So whatever protections Title V affords them, if these are unconstitutional appointments, they actually have no Title V protections. I think that's right, Your Honor. The reason that I am not lovingly embracing, as you say, this alternative is that we did not float it in our brief. A very particular way of. What? You can't take ownership of it, so you won't go in? Yeah. Yeah? Yes, from the podium, I am not going to get out ahead of the Solicitor General and embrace the savings construction that we ourselves have not proposed. If this court would like, we could certainly follow up with a 28-J letter regarding this court's proposal. But no, I'm uncomfortable, and I'm unwilling to lovingly embrace an alternative the government itself has not vetted and proposed. I see I'm out of time, Your Honor. If there are no further questions. We appreciate your help. Thank you very much, Your Honor. Your Honor, I have nothing to add to this lively debate. That's a great idea, Mr. Chau. So if there are any questions, I'm here for them. Thank you very much. All right, case is taken under submission.